Laurel GONSALVES, Petitioner,

v.

STRAIGHT ARROW PUBLISHERS,
INC., a Delaware corporation,
Respondent.

Civil Action No. 8474.

Court of Chancery of Delaware,
New Castle County.

Submitted: Feb. 2, 1998.
Decided: March 26, 1998.

Kevin G. Abrams, Thomas A. Beck, Russell C. Silberglied, Richards, Layton & Finger, Wilmington, Delaware, for petitioner.

Steven J. Rothschild, Joseph M. Asher, George F. Fraley, III, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Delaware, Attorneys for Respondent.

## MEMORANDUM OPINION AFTER REMAND

CHANDLER, Chancellor.

### OPINION

In this statutory appraisal action on remand from the Delaware Supreme Court, the central issue is the nature of the corporate enterprise. The parties dispute the degree to which the most recent year's earnings of the company's chief operating asset reflect the value of the company as a whole. Petitioner's valuation places too much weight on the recent success of this asset to the exclusion of other factors affecting the enterprise's going concern value. Respondent's valuation, on the other hand, is based on an overly pessimistic view of the company's future. After reviewing the trial record and the post-trial and appellate briefs, I direct the parties to appraise the shares in accordance with the guidelines below.

### I. BACKGROUND

Respondent Straight Arrow Publishers, Inc. ("SAP") was founded in 1967 by Jann S. Wenner ("Wenner"), editor of SAP's main operating asset, *Rolling Stone* magazine. Before the merger of Straight Arrow Publishers Holding Company, Inc. into SAP on January 8, 1986 (the "merger"), Wenner and his wife Jane controlled, directly or indirectly, 79% of SAP's common stock. As the merger effected a cash-out of then non-control stock, it did not cause a change in control. Nor did the merger effect any particular efficiencies or result in the redeployment of existing assets by new management.[1] Petitioner Laurel Gonsalves ("petitioner") dissented from the merger, declining to have her 2,000 shares converted into $100 per share, and exercised her statutory right to have this Court appraise the fair value of her shares pursuant to 8 *Del.C.* § 262.

### A. *The Business of SAP*

SAP was founded to publish *Rolling Stone*, a magazine devoted to pop culture and rock and roll music. In the early 1980s, its publishers implemented a Repositioning Plan to reorient the magazine's market position and take steps to offset the start of a decline in advertising revenues. As a result of this plan, *Rolling Stone's* advertising revenue, subscriptions, and net income all increased from 1981 to 1985.

---

1. Cf. *Cede & Co. v. Technicolor, Inc.*, Del. Supr., 684 A.2d 289 (1996).

SAP's business was not limited to publishing *Rolling Stone*. In 1981, SAP began to publish *Record*, a magazine of rock and roll music. The magazine was never a success, experiencing losses every year. Its last issue was published shortly before the merger, and publication was discontinued shortly thereafter. In 1983, another publication, *College Papers*, was also discontinued after failing to achieve profitability. Rolling Stone Productions, a licensing division, was somewhat more successful, although its earnings experienced great swings.[2] It and Rolling Stone Press, a book packaging division, were both discontinued in 1985 prior to the merger.

SAP also diversified in other ways, by investing in real estate and limited partnership ventures. An illustration of SAP's diversification, and the gains or losses attributable to its various divisions, shows:

| Division | Adjusted to reflect year ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 1981 | 1982 | 1983 | 1984 | 1985 |
| *The Record* | ($46,666) | ($118,968) | ($494,821) | ($741,545) | ($620,062) |
| Rolling Stone Press | 61,429 | (50,293) | 105,692 | (2,361) | 8,440 |
| Rolling Stone Productions | 179,335 | (85,218) | 178,827 | 305,937 | (93,163) |
| College Papers | (58,839) | (52,602) | 0 | 0 | 0 |
| *US* Magazine | NA | NA | NA | NA | NA |
| Total | 135,259 | (30 7,081) | (210,302) | (437,969) | (1,167,401) |

SAP's most recent new venture prior to the merger was its investment in a limited partnership that purchased substantially all of the assets of *US* magazine. SAP's wholly owned subsidiary was a 25% general partner in this partnership and had been required not only to invest $1 million in cash but also to issue and secure with cash a $1 million promissory note.1985 losses resulting from this investment totaled just over $450,000, and future losses were expected.

B. *The History of this Action*

Petitioner filed this action on May 5, 1986. At trial, held August 28–29, 1996, both parties supported their valuations of the fair value of petitioner's shares with the testimony of expert witnesses. Former Chancellor Allen found that the valuation of SAP's expert, Martin J. Whitman ("Whitman"), provided a more acceptable valuation of SAP overall and rejected the valuation prepared by petitioner's expert, James B. Kobak ("Kobak"). Petitioner appealed, contending, among other things, that the Chancellor failed to value the "operative reality" of SAP on the date of the merger and, instead, accepted one expert's valuation "hook, line and sinker." Respondent cross-appealed, contending that the Chancellor abused his discretion by arbitrarily awarding the legal rate of interest, without explanation.

The Supreme Court reversed in part, finding that "the Court of Chancery's pretrial decision to adhere to, and rely upon, the methodology and valuation factors of one expert to the exclusion of other relevant evidence and the implementation of that mind-set in the appraisal process was

2. *See* M.J. Whitman Report, Petitioner's Appendix, Vol. II, PX 115 at 15.

error as a matter of law." [3] In a pre-trial conference, the Chancellor had informed the parties that his "temperamental approach to this case is to want to accept [the valuation of] one expert or the other hook, line and sinker;" although he had made adjustments to valuations he had accepted in the past, he did not want to do so in this case.[4]

The Supreme Court concluded that former Chancellor Allen had decided, *before trial*, to follow his inclination to accept the whole of one expert's opinion over the other. Moreover, the Supreme Court found that his decision to accept one over the other forced the Chancellor to view aspects of the valuation process as an "either or" process whereby the rejection of one expert's valuation (or a part of one expert's valuation) automatically required the acceptance of the other expert's conflicting views. Finding that the Chancellor's "evidentiary construct he established for the subsequent trial created a standard for value determination which is at odds with Section 262's command that the Court 'shall appraise' fair value," the Supreme Court remanded for further consideration under "the Court of Chancery's statutory obligation to engage in an independent valuation exercise." [5]

### C. *Legal Standard*

 Eight *Del.C.* § 262(h) provides that this Court "shall appraise the shares, determining their fair value exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with a fair rate of interest, if any, to be paid upon the amount determined to be the fair value." The appraisal process requires the Court to consider "all relevant factors," but allows inclusion only of those elements of value "known or susceptible of proof as of the date of merger." [6] Overall, the focus is on the "operative reality" [7] on the date of merger, with the shareholder entitled to his "proportionate interest in a going concern." [8] Each side in an appraisal action has the burden of proving its respective valuation position. "No presumption, favorable or unfavorable, attaches to either side's valuation, including the actual merger price." [9]

### D. *Law of the Case*

 The doctrine of law of the case normally requires that matters previously ruled upon by the same court remain at rest.[10] This Court has applied this doctrine in several cases following a Supreme Court remand, most recently in *Thorpe v. CERBCO, Inc.*, where the Supreme Court remanded for a determination of damages.[11] In a later opinion awarding attorneys' fees, the Court of Chancery addressed an argument that it should reconsider certain issues:

3. *Gonsalves v. Straight Arrow Publishers, Inc.*, Del.Supr., 701 A.2d 357, 358 (1997) [hereinafter "Supr.Ct.Op."].

4. Petitioner's Opening Appellate Br., Appendix, Vol. I, Tab 6 at 3–4.

5. Supr.Ct.Op. at 361, 362.

6. *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 713 (1983).

7. *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 684 A.2d 289, 298 (1996).

8. *Tri–Continental Corp. v. Battye*, Del.Supr., 74 A.2d 71, 72 (1950), *cited approvingly by, In the Matter of the Appraisal of Shell Oil Company*, Del.Supr., 607 A.2d 1213, 1218 (1992).

9. *Pinson v. Campbell–Taggart, Inc.*, Del.Ch., C.A. No. 7499, Jacobs, V.C., 1989 WL 17438 (Feb. 28, 1989), slip op. at 17.

10. *Frank G.W. v. Carol M.W.*, Del.Supr., 457 A.2d 715, 718 (1983).

11. Del.Supr., 676 A.2d 436 (1996).

The doctrine of law of the case promotes efficiency and fundamental fairness in cases by counseling against the reconsideration of issues that have already been decided. When an appellate court reviews the judgment of a trial court, however, the trial court will, of course, follow any direction given by the higher court and otherwise respect its determinations of law and fact. Unless the appellate court has either expressly or impliedly overturned the trial court's findings, however, the doctrine of law of the case dictates that ordinarily prior findings of the trial court continue as authoritative in the case. Thus, only to the extent the Supreme Court has reversed the findings or conclusions of the prior proceeding need or may this court take up those matters for a new or different analysis.[12]

Only to the extent the Supreme Court expressly or impliedly overturned findings made by former Chancellor Allen in his post-trial decision may I reconsider such decisions.

The parties agree that former Chancellor Allen's decision on respondent's motion *in limine* to exclude proposed testimony relating to the market value of SAP's CEO's compensation is the law of the case. In that decision, the Chancellor rejected the proposed evidence as irrelevant,[13] and the Supreme Court clearly, and separately

from the discussion of the appraisal process, affirmed his decision.[14] Accordingly, I will not reconsider this issue on remand.

Petitioner argues that there are two additional decisions that constitute law of the case below. First, she asserts that "it is the law of the case that SAP's expert, Mr. Whitman, reverse-engineered his purported comparable companies analysis."[15] Second, petitioner asserts that it is law of the case that her post-merger evidence relating to the value of SAP is admissible.

Respondent asserts that every time the Supreme Court factually described a decision by the experts but then failed to critically discuss the Chancellor's express or implied ruling on the propriety of that decision, the Chancellor's decision below is the law of the case. For example, respondent notes that former Chancellor Allen rejected several of Kobak's proposed adjustments to SAP's earnings.[16] Respondent argues that because the Supreme Court noted the *fact* that Kobak's valuation reflected such adjustments, but did not, in respondent's view, "expressly or implicitly reverse" the Chancellor's rejection of these adjustments, the Chancellor's rejection of these adjustments should be accepted as law of the case. Following this reasoning, respondent identifies four issues it considers to be the law of the case. First, respondent asserts that SAP

---

12. *Thorpe v. CERBCO, Inc.*, Del.Ch., C.A. No. 11713, Allen, C., 1997 WL 67833 (Feb. 6, 1997), slip op. at 8 (citations omitted), *aff'd*, Del.Supr., No. 77, 1997, Berger, J., 1997 WL 776169 (Dec. 3, 1997).

13. *Gonsalves v. Straight Arrow Publishers, Inc.*, Del.Ch., C.A. No. 8474, Allen, C., 1996 WL 483093 (Aug. 22, 1996), slip op. at 5.

14. Supr.Ct.Op. at 362 ("Although we conclude that the valuation determination of the Court of Chancery must be reversed, to assist the court and the parties on remand, we take the occasion to rule upon a separate and

significant claim of error asserted by Petitioner—the exclusion of evidence that SAP should be valued, on an ongoing basis, with an adjustment for alternative CEO compensation.").

15. K. Abrams, December 24, 1997, Letter to the Court at 2.

16. *Gonsalves v. Straight Arrow Publishers, Inc.*, Del.Ch., C.A. No. 8474, Allen, C., 1996 WL 696936 (Nov. 27, 1996, *revised* Dec. 5, 1996), slip op. at 18–19 [hereinafter "Allen's Op."].

must be valued as a whole, as it operated up to the merger date, rather than valued solely on the basis of the earnings of *Rolling Stone*. Second, respondent asserts that the investment in *US* magazine must be considered as an active, rather than a passive, investment. Third, respondent contends that this Court may not reconsider the Chancellor's decision to reject Kobak's addition of deferred subscription income or, as described above, the Chancellor's decision to reject Kobak's other adjustments to earnings. Finally, respondent argues that this Court must accept the selection of Whitman's earnings multiple.

I cannot agree with respondent's assertion that the Supreme Court failed to expressly or implicitly overrule each issue identified by respondent as law of the case. The Supreme Court concluded that former Chancellor Allen failed to perform an independent appraisal analysis as required by 8 *Del.C.* § 262. The error, as I believe that error is explained by the Supreme Court, is not that the Chancellor concluded that the going concern value of a company is properly represented by the valuation of one expert (and thus accepted the precise value as determined by one expert), but that the decision to accept one valuation over another, *in toto*, was pre-determined. Instead, this Court's ultimate valuation decision should be based on considerations of the specific issues addressed in each expert's valuation analysis, rather than a conclusion that the entire valuation of one expert should be accepted on the theory that doing so serves certain larger, institutional concerns.

■ Mindful of the fact that the Supreme Court takes " 'a dim view of a successor judge in a single case overruling a decision of his predecessor,' " [17] I will only

reconsider 1) issues where former Chancellor Allen's decision does not expressly provide justification for both the rejection of one expert's conclusion *and* the acceptance of the other expert's conclusion, and 2) issues that, although fully supported initially, need to be re-addressed to reflect the availability of new information not previously available. All other issues constitute law of the case.

## II. ANALYSIS

The parties produced widely divergent valuations of SAP's stock on the merger date. Nevertheless, the parties' experts agreed, for the most part, that the earnings capitalization formula was the most appropriate methodology for valuing petitioner's shares. Most of the issues on remand concern the inputs to the earnings capitalization method, such as whether SAP's reported earnings should be adjusted, what is the earnings period that should be capitalized, and what multiple should be used to capitalize earnings and interest. My analysis of these issues follows.

### A. *Earnings Capitalization*

The vast difference between the experts' valuations of SAP as a going concern results from their opposing views of SAP as a whole. If one were to believe petitioner, SAP was a phoenix finally rising from the ashes of numerous unsuccessful diversification efforts on the wings of *Rolling Stone* and the Repositioning Plan. According to this view, the recent growth of *Rolling Stone* was merely the start of a long trend of future prosperity for SAP as a whole.

If one were to believe respondent, on the other hand, SAP was a company in the business of launching new publishing-related and other diversified businesses, with

---

**17.** *Myer v. Dyer,* Del.Super., 643 A.2d 1382 (1993) (citations omitted).

*Rolling Stone* being merely one of those businesses that had not been divested and had only recently begun to soar. As a result, respondent contends that it is inappropriate to view the future of SAP as based primarily, if not entirely, on the recent success of *Rolling Stone*, as SAP's investments are not limited to *Rolling Stone*. Moreover, *Rolling Stone* would need to successfully weather 1) the increasing challenges of a new competitor, 2) the threat of declining advertising revenues due to a possible increase in government regulation of the tobacco and liquor industries, and 3) the continued challenge posed by competition from general interest magazines. All of these challenges would have to be met before one could accurately determine if *Rolling Stone* and the Repositioning Plan were truly the phoenixes' wings of petitioner's vision or merely the temporary salvation of Icarus' doomed wax wings.

Both experts based their valuations on a capitalized earnings model.[18] This model, which may be used to predict the market capitalization that a private company would enjoy were it publicly traded, requires two basic inputs: a measure of the company's earnings and a capitalization rate. Measures of earnings frequently employed include the company's earnings before interest and taxes ("EBIT") or the company's earnings before interest, taxes, depreciation and amortization ("EBITDA"). The capitalization rate is obtained through a comparison with similar publicly traded companies whose market capitalization and earnings measures are publicly disclosed.[19] By applying the implied capitalization rate of the public companies to the earnings measure of the comparable private company, an estimate of the private company's capitalization may be obtained.

■ The legitimacy of this formula depends on the validity of at least four key decisions: the choice of an appropriate earnings measure (*e.g.*, EBIT, EBITDA); 2) the selection of the historical time period on which the measure is based; 3) the determination of which adjustments, if any, should be made to the earnings measure to reflect items such as non-recurring expenses; and 4) the determination of an appropriate capitalization rate. In this case, all of these decisions are inseparably intertwined, for each depends on which view of SAP one accepts: that of the phoenix soaring out of the ashes or that of Icarus rising dangerously toward the sun. To ease the flow of the discussion below, I begin with a brief comment on the parties' selection of an appropriate capitalization rate.

### 1. *Selection of Capitalization Rate*

Former Chancellor Allen's Opinion provides a full explanation for the rejection of Kobak's capitalization rate, as well as support for the adoption of Whitman's capitalization rate. My analysis does not affect any of the former Chancellor's assumptions or the arguments of the parties.[20] If

18. A capitalized earnings model is an acceptable valuation method, if properly employed, especially for companies with significant intangible assets and few fixed assets. *See, e.g.*, *In re Radiology Assoc.*, Del.Ch., 611 A.2d 485, Chandler, V.C. (1991).

19. For example, a company with an observable market capitalization of $200 million and an EBIT earnings measure of $16 million would have an implied earnings capitalization of 12.5 ($200 ÷ $16 = 12.5).

20. None of the discussion below affects the validity of former Chancellor Allen's conclusions that 1) Kobak's selection of the highest of the median multiples of his selected comparable companies was "counter-intuitive" given SAP's history of highly volatile earnings, 2) that Kobak's mathematical calculations appeared to be slightly erroneous, or 3)

anything, the additional observations and conclusions below add further support for his decision that Whitman offered a more appropriate capitalization rate.[21] Accordingly, I decline to re-open this matter on remand.

### 2. Measuring Earnings

Consistent with petitioner's view that the value of SAP was largely represented by the recent success of *Rolling Stone*, Kobak elected to capitalize *Rolling Stone's* 1985 calendar year earnings. He believed that this one-year period (rather than a longer time period) was justified because SAP's earlier years' earnings were distorted by the inclusion of relatively unsuccessful ventures that SAP had sold or dissolved by the time of the merger, and because only the earnings base of 1985 truly reflected the success of the Repositioning Plan. After adjusting earnings to reflect what he believed to be non-recurring expenses, Kobak calculated *Rolling Stone's* capitalization with the assistance of the implied capitalization rates of his selected comparable companies. He then made further adjustments to reflect SAP's other businesses and reach the total value of SAP as an enterprise.[22]

Respondent's expert capitalized SAP's five-year (1981–1985) average EBIT and EBITDA on the belief that a shorter period would place too much emphasis on the peak years' profits or contain figures too varied to average. He also felt that the value of SAP as a going concern should be valued by focusing on SAP's earnings as a whole, rather than just the earnings of *Rolling Stone*. Accordingly, respondent supported its selection of a five-year period of SAP's earnings by noting ·that it provided "for a balanced valuation reflecting the wide variability of SAP's actual earnings performance."[23]

Former Chancellor Allen pointed out that acceptance of Kobak's proposed one-year earnings base would require the Court to find "that something very elementary and important with respect to the company's financial performance had re-

---

that Whitman's multiples appeared to be "more accurate and reasonable than Mr. Kobak's, given the financial position of SAP as of the date of the Merger"—a position characterized by "SAP's predominant dependence on a single product; the volatility of its earnings historically; its low operating margins; and its small capital investment." Allen's Op. at 16–17.

**21.** In addition, I am suspicious of Kobak's methodology because his comparable companies were limited to those whose ownership had recently changed. (*See* Kobak Report, Petitioners' Appendix, Vol. I, PX1 at 27–29, explaining multiple was based on what buyers had paid). As a result, Kobak's valuation included a control premium. Petitioner, however, owns shares in a company where the majority shareholder owned 79% of the stock prior to the merger. Thus, Kobak's method *assumes* that "fair value" in an appraisal action properly includes a *pro rata* share of a control premium even though the company here had a controlling block of stock. I doubt whether this method properly values such a company *as a going concern*, but I need not decide that question because I have other reasons for rejecting Kobak's methodology and accepting Whitman's.

**22.** These adjustments reflecting SAP's other businesses were not capitalized with the same capitalization rate he applied to the earnings measure of *Rolling Stone*. They were not so capitalized because Kobak did not believe that SAP's investments in these assets were active assets deserving of such capitalization. Thus, Kobak did acknowledge that SAP had assets other than *Rolling Stone*. While it would be inappropriate to state that he valued SAP as if it only consisted of *Rolling Stone*, it may be said that his inclusion of these assets without any adjustment for capitalization reflects his belief that SAP's future earnings would be based entirely on the potential earnings of *Rolling Stone*.

**23.** Respondent's Post–Trial Br. at 18.

cently occurred, making the prior years, in effect, irrelevant." [24] Noting that SAP had a history of volatile earnings, the Chancellor did not believe that such a change had occurred with respect to SAP's earnings and found that Kobak failed to "present a persuasive reason to depart from the standard use of a five year earnings base." [25] Finally, the Chancellor concluded that "[s]ince there is no way to judge whether the substantially higher 1985 earnings were aberrant or sustainable, without the inappropriate aid of hindsight, the fair value of SAP as of the Merger date should in this instance be approximated using the standard five year average approach which was employed by Mr. Whitman." [26] Implicitly, the Chancellor thus indicated his acceptance of not only the use of a longer earnings base but also the use of the earnings base of SAP, not *Rolling Stone.*

On appeal, the Supreme Court noted that there was justification for the Chancellor's decision to reject Kobak's use of a one-year earnings base but noted that "[r]ejection of a one year earnings base, however, does not, *ipso facto,* require acceptance of Whitman's alternative five year base." [27] The Supreme Court also questioned the Chancellor's conclusion that he was unable to determine if SAP's recent earnings were sustainable without the "inappropriate aid of hindsight."

> As the Chancellor noted earlier in his opinion, post-merger evidence is not necessarily inadmissible to show that plans in effect at the time of the merger have born fruition. In *Cede & Co. v. Technicolor, Inc.,* we noted that the failure to value the company as a going concern may result in an understatement of fair value. While speculative elements of value should be excluded from the valuation calculus, the purpose of such restriction is to eliminate *"pro forma data,"* not to bar expert evidence of value based on the nature of the enterprise.[28]

I find it is necessary to reconsider the acceptance of a five-year base in the absence of any presumption in its favor and in light of admissible post-merger evidence on the subject of SAP's value. First, I note that former Chancellor Allen rejected the use of a one-year base because SAP had a history of volatile earnings and because he could not conclude that SAP had recently undergone a change of such magnitude as would justify the belief that the most recent year's earnings, viewed alone, were representative of the company as a whole as it stood on the date of the merger. Second, I note that his conclusion supported the rejection of a one-year base in general, not just the one-year base of SAP or the one-year base of *Rolling Stone.* As both parties recognize, SAP's 1985 earnings consisted largely of the earnings of *Rolling Stone.* But, as the Chancellor's Opinion reveals, and as I independently conclude below, SAP was not a company whose business was limited to publishing *Rolling Stone.*

### a. Scope of the Earnings Base

As former Chancellor Allen noted, the history of SAP revealed "a need and desire to try new enterprises in an effort to diversify earnings and … a modest ability to successfully do so." [29] Moreover, the fact that certain areas of business had recently

---

24. Allen's Op. at 15.

25. *Id.*

26. *Id.* at 15–16.

27. Supr.Ct.Op. at 361.

28. *Id.* at 362 (citations omitted).

29. Allen's Op. at 16 n. 20.

been discontinued did not contradict the fact that "the need and talent of management to successfully diversify into other areas remained."[30] When viewed in the light of SAP's history, the fact that *Rolling Stone* (and thus, SAP as a whole) experienced incredible success in 1985 was just as anomalous as the fact that SAP had relatively few other operating assets in 1985, as it recently had divested *Record*, Rolling Stone Production and Rolling Stone Press.

Petitioner's argument that because respondent has failed to show the existence of any plans for further diversification, so that according to the standard announced in *Weinberger* the possibility of such diversification should be eliminated from the valuation decision as unsupported by value that is "known or susceptible of proof as of the date of the merger,"[31] is somewhat disingenuous. To a large degree, petitioner is similarly unable to provide that level of proof of the continued success of the Repositioning Plan and *Rolling Stone*. Petitioner does offer some internal projections of *Rolling Stone's* future earnings and post-merger evidence of *Rolling Stone's* actual earnings,[32] but petitioner fails to acknowledge that SAP is not a company whose value is properly determined by the success of *Rolling Stone* alone.

Stated differently, petitioner's decision to value SAP by relying on the last year's performance of *Rolling Stone* is suspect for two reasons. First, even if it were appropriate to consider a valuation of SAP based on the assumption that *Rolling Stone* was its only operating asset, a one-year earnings period does not sufficiently reflect the variation in the earnings of *Rolling Stone* itself. As petitioner notes, *Rolling Stone's* success was relatively recent and its ability to maintain its recent performance was called into question by the existence of potentially formidable challenges to its market position and ability to attract and retain advertisers. Second, even if I were to find that this error in petitioner's valuation could be corrected by extending the valuation to include a longer, more representative history of *Rolling Stone's* performance, I conclude that such a tactic would not solve the fact that petitioner's valuation also fails to acknowledge that SAP is a company not represented solely by its investment in *Rolling Stone*.

### b. Period of the Earnings Base

The question whether respondent's chosen valuation period accurately reflects the nature of SAP as a going concern is subject to the same level of scrutiny as the scope question. I reject respondent's contention that consideration of a shorter time period would improperly place *too* much emphasis on the recent successful earnings of *Rolling Stone* or SAP as a whole. Yet, I agree with former Chancellor Allen's observation that the record does not support a conclusion that SAP had undergone a major change sufficient to justify the belief that SAP's 1985 earnings represented the value of SAP as a going concern.

---

**30.** *Id.*

**31.** *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 713 (1983).

**32.** Petitioner states that, according to the tender offer materials, SAP expected *Rolling Stone's* earnings to increase by 156% and that post-merger evidence reveals that it actually increased by 239%. Similarly, petitioner notes that advertising revenue, subscription revenue, and single copy revenue all increased over 1985 results. *See* Petitioner–Appellant's Supreme Court Opening Brief at 5–6. None of this information, however, changes the fact that SAP's financial results are not necessarily reflected solely by *Rolling Stone's* performance.

An appropriate valuation method in the circumstances here should, in my opinion, acknowledge the fact that SAP was a company in the business of publishing *Rolling Stone* as well as exploring ways to invest profitably the cash generated by *Rolling Stone* and SAP's other investments. Such a method also should recognize the fact that *Rolling Stone's* success immediately before the merger was of a magnitude not experienced by any of SAP's other business ventures. Whether the growth of *Rolling Stone* was sustainable, at what level, and for how long, is not known with certainty. It must be acknowledged, however, that SAP was operating under a Repositioning Plan that generated a success larger than any ever before experienced and that this success was not the result of outside factors, but rather was the result of this internal operating plan under which SAP was operating on the date of the merger. The fact that this plan was successful and that *Rolling Stone* was providing a larger portion of SAP's revenue than ever before, must be reflected in the valuation of SAP as a whole. Nevertheless, the valuation must not ignore the fact that SAP was still a company without a history of relying on one operating asset.

I conclude that five years is an appropriate time period over which to examine the earnings of SAP. This length of time reflects the creation and elimination of more than one SAP asset, and thus reflects the nature of the enterprise as an enterprise with a *consistent history of attempts to diversify*. Equal emphasis on each of the past five years, however, would fail to reflect the fact that SAP management had rather recently developed the operating plan responsible for a large part of SAP's recent success. Whether that success would continue, or whether the success of SAP's management with the Repositioning Plan might even provide benefits that could be utilized in connection with SAP's other investments, is unknown. But we do know that SAP was operating under a plan that appeared to be causing at least the start of an upward trend in earnings unlike anything in SAP's history.

Accordingly, I believe it is appropriate to consider the full five years of SAP's earnings, but to place greater weight on the more recent years. In this way, the nature and history of the enterprise will not be ignored, nor will the company's less successful past prevent recognition of recent trends. Therefore, I direct the parties to weight SAP's earnings over the past five years, starting with 1981 and placing one additional weight on each successive year. Thus, the years and the weights should be: 1981(1); 1982(2); 1983(3); 1984(4); and 1985(5).

I recognize that it may seem inconsistent to apply a capitalization rate based on the *average earnings* over five years to an earnings measure based on a *weighted average* of five years. The difference is not problematic, however, because the assumptions justifying Whitman's adjustment of the comparable companies' median capitalization rate match the assumptions supporting the Court's selection of SAP's appropriate earnings measure. I believe it is necessary to weight SAP's earnings as I have described in order to maintain a consistent view of SAP as a going concern. This view is carried through to the discussion below on the adjustment to earnings. In that discussion, bear in mind that petitioner has attempted to impress her particular view of SAP as a whole on the final capitalization figure by adjusting SAP's yearly earnings, while respondent has attempted to impress its view of SAP as a whole on the final capitalization figure by adjusting the capitalization rate.

### 3. *Adjustments to Earnings*

Petitioner argues that the Court cannot accept an earnings base of SAP's historical five-year earnings unless it adjusts those earnings to reflect non-recurring costs and other necessary adjustments. Specifically, petitioner seeks adjustments for costs incurred in connection with a change in printers, SAP's investment in *US,* and the discontinuance of other businesses. In addition, petitioner seeks to adjust SAP's earnings to reflect an increase in deferred subscription revenues.

■ First, petitioner seeks to adjust SAP's 1984 calendar year earnings by $871,000, over half of which ($570,000) is claimed to be the amount paid to cancel a printing contract.[33] Respondent argues that this charge is best described as an acceleration of expense, rather than a non-recurring cost, as the payment to SAP's existing printer allowed SAP to cancel that contract and to contract with another company for lower printing costs in the future. Respondent also argues that petitioner has failed to support the need for the remainder of the $870,000 adjustment. As respondent's expert management consultant, Daniel McNamee ("McNamee"), explained, SAP was spending upwards of $5,000,000 per year on printing costs; McNamee believed the savings SAP would obtain by switching printers would have been reflected in the following year's expenses.[34]

Moreover, he estimated such savings to amount to between 10–15% of the previous printing costs or, in this case, at least enough to cover the full cost of buying out the old contract.[35] It must be noted, however, that McNamee had not seen the actual contract and did not know what specific savings, if any, SAP received.[36]

Petitioner has failed to adequately explain why the $870,000 should be treated as non-recurring costs and deducted from SAP's earnings. Whether the cost associated with the change of printing contracts was motivated by savings or, as petitioner appears to imply, by the need for a printer that could better meet the growing needs of *Rolling Stone,*[37] the costs were associated with a very basic aspect of SAP's operations. Accordingly, I conclude that SAP's earnings should not be adjusted for the cost of canceling the printing contract. Nor should the earnings be adjusted in 1984 or 1985 to reflect lowered costs.[38] I also decline to adjust SAP's earnings to reflect the other expenses in the proposed $871,000 adjustment, as petitioner has failed to sufficiently explain—and to a large degree even address—the justification for such adjustments.[39]

■ Second, petitioner seeks to adjust SAP's earnings to reflect $51,000 in legal expenses incurred in connection with SAP's acquisition of an interest in *US* magazine.[40] According to respondent, the

---

**33.** Trial Tr. (Aug. 28, 1996) at 84–85.

**34.** Trial Tr. (Aug. 29, 1996) at 350–51.

**35.** *Id.*

**36.** *Id.* at 416–17.

**37.** *See* Petitioner's Post–Trial Br. at 69 n. 37.

**38.** Petitioner adjusts the 1984 and 1985 earnings by $48 and $44 million, respectively. These figures represent the lower printing costs charged by the new printer, specifically

in order to help SAP meet the costs of canceling the old contract.

**39.** Petitioner directs the Court to PX 38 for a list of these adjustments, but nowhere in Kobak's report nor at trial does petitioner provide an explanation of the need for such adjustments. *See* Trial Tr. (Aug. 28, 1996) at 231–32; Petitioner's Appendix, Vol. I, PX 1 at 17–18.

**40.** *See* Trial Tr. (Aug. 28, 1996) at 83–84; PX 1 at 18.

legal expenses to which petitioner refers are expenses incurred in connection with SAP's share repurchase, not SAP's investment in *US*.[41] Respondent further contends that even if the expenses were associated with SAP's investment in *US*, the investment in *US* was active, not passive, and thus a part of the ongoing value of SAP that must be preserved, not eliminated.[42] Respondent is correct. If SAP did not have a history of consistent attempts at diversification, these expenses might be properly viewed as non-recurring and, thus, items properly excluded from earnings as elements not reflective of SAP's value as a going concern. Because SAP was, in essence, in the business of diversification, these costs, if they were legal costs associated with the investment in *US*, must be considered as necessary evils resulting from SAP's efforts to diversify. Accordingly, I decline to deduct these costs from SAP's earnings, as they cannot properly be viewed as non-recurring costs of SAP's business.

■ Third, petitioner seeks to adjust SAP's 1985 earnings by $334,000 for general and administrative expenses that she claims are not associated with SAP's operation of *Rolling Stone*, but instead result from operation, or termination, of SAP's other businesses.[43] I reject the exclusion of these costs for the same reason I reject the exclusion of the legal expenses incurred in connection with the acquisition of *US*. They must be viewed as necessary evils of SAP's business. Moreover, even if it were improper to include such costs in the valuation of SAP as a going concern,

Kobak admitted that he was not sure that he had properly identified these costs.[44]

Fourth, petitioner attempts to reargue the Chancellor's decision to reject her proposed adjustment to SAP's earnings to reflect the increase in deferred subscription revenue. The Chancellor's reasoning on this issue thoroughly addresses all of petitioner's claims. His decision is the law of the case.

Finally, petitioner briefly raises a claim that the Chancellor failed to address Kobak's adjustments to SAP's earnings to reflect SAP's tax expenses.[45] Yet, both parties agree that SAP should be valued on a before-tax basis, as this is the standard valuation practice for companies in the publishing industry, and petitioner admits that respondent valued SAP on a before-tax basis. To the extent either party believes this issue remains unresolved, I conclude that SAP should be valued by examining its earnings on a before-tax basis.

### B. *Adjustment to SAP's Capitalization*

With the guidelines described above, the parties' experts should be able to confer and calculate SAP's capitalization. Petitioner argues, however, that this capitalization will not properly reflect the value of SAP as a going concern unless an adjustment is made to reflect SAP's excess cash. Moreover, petitioner argues that former Chancellor Allen's failure to expressly address this issue and describe his reasons for rejecting such an addition were violations of his duty under § 262 to perform an independent valuation.

---

**41.** *See* Respondent's Appendix, Vol. II, RX 25 at S3101.

**42.** *See* Allen's Op. at 5 n. 7 (finding that SAP's investment in *US* was an active investment because, among other things, SAP provided some management personnel).

**43.** *See* Trial Tr. (Aug. 28, 1996) at 90–91, 94–95, PX 1 at 17–18.

**44.** *See* Trial Tr. (Aug. 28, 1996) at 228–230.

**45.** *See* Petitioner's Opening Appellate Br. at 31; Petitioner's Post–Trial Br. at 66–68.

In my opinion, the evidence on this issue is thoroughly and accurately described in the Chancellor's Opinion.[46] In sum, the decision rested (and still rests) on whether the Court believed Whitman and McNamee, who both concluded that SAP required sixty days of working capital, or Kobak, who concluded that SAP required only thirty days of working capital. Both Whitman and Kobak predicated their views on analysis of SAP's financials, while McNamee based his view on the standard amount required in the publishing industry. I agree with former Chancellor Allen's implicit decision to accept the opinions of Whitman and McNamee. Thus, I find no need to adjust SAP's capitalization to reflect the existence of excess cash.

### C. *Consideration of Other Valuation Methods*

In addition to calculating SAP's earnings capitalization value, respondent calculated SAP's asset and market values. Respondent's methods and assumptions underlying each of these valuation formulas are thoroughly explained in former Chancellor Allen's Opinion. He did not, however, specifically critique either formula or comment on whether either result should be weighted with SAP's value as calculated using the earnings capitalization model. I reject the use of the asset and market value models. While both models may be used, in an appropriate situation, to provide a relevant estimate of fair value, I cannot conclude that the use of either model is appropriate *in this case.*

As Whitman noted, there were only six transactions involving the sale of SAP stock in the five years before the merger and none in the twenty-one months immediately prior to the merger. Moreover, in every case, SAP was the purchaser. I am unable to conclude that a market value based on such a thin market deserves *any* weight in this appraisal action. Similarly, Whitman's asset values deserve no weight. Both parties concede that SAP is a company with few tangible assets. Moreover, even respondent argues elsewhere that it is inappropriate to "theorize about *Rolling Stone's* potential sale price."[47] I do not understand, therefore, why it would be appropriate to consider the asset value resulting from respondent's theoretical takeover method. Accordingly, I direct the parties to consider only SAP's value as calculated by the earnings capitalization method described above.

### D. *Post–Merger Interest*

The Supreme Court directed that the rate of interest and the period of time for which interest is awarded be addressed on remand. An award of interest in an appraisal case is a statutory adjustment that serves two purposes. It is intended to compensate a petitioner for the loss of use of the fair value of her shares during the pendency of an appraisal process and to cause the surviving corporation to give up the benefit it obtained from the use of the fair value of petitioner's shares during that same period.[48]

Although one can point to cases where this Court has considered the legal interest rate relevant to the fair rate in an

---

46. *See* Allen's Op. at 11, especially n. 13.

47. Respondent's Post–Trial Br. at 14.

48. *See Hintmann v. Fred Weber, Inc.,* Del.Ch., C.A. No. 12839, Steele, V.C., 1998 WL 83052 (Feb. 17, 1998), slip op. at 33; *Gilbert v. MPM*

*Enterprises, Inc.,* Del.Ch., 709 A.2d 663, 674 Steele, V.C. (1997); *Grimes v. Vitalink Communications Corp.,* Del.Ch., C.A. No. 12234, Chandler, C., 1997 WL 538676 (Aug. 26, 1997), slip op. at 25.

appraisal action,[49] I have said before that I do not think it is appropriate to consider the legal interest rate where the parties have provided a substantial amount of evidence as to a fair rate. The legal interest rate, in other words, serves as a useful default rate when the parties have inadequately developed the record on the issue.[50] Where, as here, the record is sufficiently developed, the legal interest rate (with one exception) simply is not relevant.

### 1. *The Prudent Investor Rate*

Petitioner argues that this Court should apply a compound prudent investor rate that provides for a yearly yield of 12.2%. Kobak calculated this rate by developing a portfolio consisting of equity investments such as the Standard and Poor's 500(60%), a blend of mid- and long-term U.S. Treasury bonds (30%), and a mix of short-term investments such as one-year U.S. Treasury bonds and six-month certificates of deposit (10%). Kobak contends that this allocation is "extremely close" to the blend referred to by the *Wall Street Journal* since April 1988 as "the standard middle-of-the road blend," the "traditional blend," and the "classic textbook portfolio blend." That blend consists of 55% equity investments, 35% bonds, and 10% treasury bills or money market funds. Petitioner further notes that the blend is similar to the average asset allocation recommended by "top Wall Street brokerage firms" and published in the *Wall Street Journal* as far back as 1987: 57.1% equity, 31.3% bonds, and 11.6% cash.

Respondent's suggested allocation for the prudent investor rate is based on the allocation accepted by this Court in *Chang's Holdings:* 20% ten-year treasury bonds; 20% Moody's AAA corporate bonds; 20% average risk mutual funds; 15% 90–day treasury bills; 15% 90–day commercial paper; and 10% one year certificates of deposit.[51] Petitioner argues that respondent's forty percent allocation in short-term investments would not even match inflation. But the prudent investor rate is based on what a prudent investor *would have done* at the time, not what, on hindsight, appears to have been the best investment or what appears to have outpaced inflation.

I reject petitioner's calculation of the prudent investor rate, however, because petitioner has failed to explain how she calculated some of the rates on which her ultimate conclusion is based. For example, in his report, Kobak fails to explain how he weighted or averaged the mid- and long-term treasury bonds or the two categories of short-term investments to arrive at the mean returns of 7.32% and 6.22%, respectively.[52] Kobak may have employed a straight average, but as no specific numbers are provided, I cannot be sure. Moreover, Kobak notes that his suggested allocation varies only slightly from the other recommended allocations he identifies. But he fails to explain why—if these other allocations are representative of the prudent investor rate—his allocation should *vary at all.* Had Kobak provided, and justified, the specific rates employed for each of his categories, it might have been

**49.** *See, e.g., Neal v. Alabama By–Products Corp.,* Del.Ch., C.A. No. 8282, Chandler, V.C. (Aug. 1, 1990), slip op. at 52 (awarding legal interest rate to compensate plaintiff for long delay in payment resulting from protracted litigation).

**50.** *See Chang's Holdings, S.A. v. Universal Chemicals & Coatings, Inc.,* Del.Ch., C.A. No. 10856, Chandler, V.C., 1994 WL 681091 (Nov. 22, 1994), slip op. at 5–6.

**51.** *Id.* at 9.

**52.** *See* Kobak's Report, PX1 at 32.

possible to adjust his allocation percentages. As this detail is not provided, I must reject Kobak's prudent investor rate. While others might argue that a slightly different allocation is appropriate, I find no reason to conclude that Whitman's allocation percentages are not representative of a prudent investor rate. In addition, the calculation of his rate is thoroughly explained and supported with the necessary details. Thus, I accept Whitman's proposed allocation percentages for the prudent investor rate.

### 2. SAP's Cost of Borrowing

Petitioner fails to provide any evidence of SAP's cost of borrowing. As for respondent, Whitman's cost of borrowing is allegedly based on consideration of three different types of SAP's debt. Whitman fails, however, to provide any detail regarding how he was able to determine yearly costs of debt from the three rates of interest alone. His report merely provides the estimated cost of debt for each year during the pendency of the proceeding, without discussing the amount of any type of debt at any specific time or explaining how he weighted the various types of debt to reach his final figures. Because petitioner has failed to provide any evidence of the cost of debt, and respondent has failed to provide a credible explanation of its calculations, I must rely on the legal rate to provide an estimate of SAP's cost of debt.

### 3. Adjustment for Delay

Respondent suggests that the Court should adjust any final award of interest to reflect the fact that petitioner has delayed these proceedings. Respondent complains that former Chancellor Allen, without explanation, awarded the legal rate of interest over a ten-year period and failed to address respondent's argument to adjust for the delay. According to respondent, the interest rate should be awarded for only a three-year period due to petitioner's delay in prosecuting this case.

I have reviewed the trial record. It is true that this case took ten years to reach trial. It also is true that the case inexplicably appears not to have been actively litigated for months at a time during this ten-year period. Nothing in the record, however, establishes that the delay was intentional or part of a strategic maneuver by petitioner. Although respondent complained about the delay on more than one occasion, the Chancellor never formally considered dismissing the case for lack of prosecution under Court of Chancery Rule 41(e). I also note that, at trial, neither petitioner nor respondent introduced evidence on the nature of the delay or who was responsible for it. Therefore, I find no basis for concluding that the delay was occasioned deliberately by petitioner. As did the former Chancellor, I decline to adjust the time period for payment of interest in a manner that would effectively punish the petitioner with no clear basis for doing so.

### 4. Calculation of Final Interest Award

The final award of interest should be calculated as follows: 1) the prudent investor rate shall consist of the weightings identified by respondent; and 2) the interest rate for SAP's common stock shall be the average of the prudent investor rate and the legal interest rate since the merger, adjusted and compounded monthly.

## III. CONCLUSION

The parties shall instruct their experts to recalculate SAP's value using the earnings capitalization method over a five-year period with the weightings applied as described above. In addition, the parties shall recalculate the interest award based

on an equal weighting of respondent's prudent investor rate and the legal interest rate as adjusted and compounded monthly since the date of the merger. Once the appropriate calculation has been performed, I ask the parties to confer and to agree, if possible, on a form of order setting forth the recalculated valuation, consistent with the guidelines that I have tried to provide in this decision after remand.

IT IS SO ORDERED.