# COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

PATRICIA W. GRIFFIN
MASTER IN CHANCERY

CHANCERY COURTHOUSE
34 The Circle
GEORGETOWN, DELAWARE 19947

Final Report:     October 1, 2018
Date Submitted:   September 28, 2018

Craig A. Karsnitz, Esquire
Young Conaway Stargatt & Taylor
110 West Pine Street
PO Box 594
Georgetown, DE 19947

Eugene H. Bayard, Esquire
Morris James Wilson Halbrook & Bayard
107 West Market Street
PO Box 690
Georgetown, DE 19947

Penny West
32172 Roxana Road
Ocean View, DE 19973

RE:   Estate of Harold E. Marvel
      Register of Wills Folio No. 152

Dear Counsel and Ms. West:

Pending before me are exceptions to the final accounting for an estate. The exceptant claims that the accounting fails to account for the full value of the decedent's farming business, which the exceptant asserts the decedent owned as a sole proprietorship, and for funds in the decedent's personal bank account, which she alleges was a convenience account, among other issues. The executrix denies all of the claims, responding that the farming business was a closely held corporation in which the decedent was a minority interest holder, that the decedent's interest was properly valued, and the bank account was a joint account

and not a convenience account. The purported majority owner of the farming business took similar positions as those taken by the estate related to the business. For the reasons set forth below, I conclude that the farming business was a corporate entity which, given the circumstances, was not improperly valued by the estate. I also conclude the bank account was a convenience account and recommend that the estate's first and final accounting be adjusted accordingly. This is a final report.

## I. Background

Harold Marvel ("Harold") died on March 22, 2013, leaving four surviving children – Penny West ("Penny" or "exceptant"), Donna Sue McInnis ("Donna" or "executrix"), Rolland Marvel, Sr. ("Rolland"), and Vicky Andrews.[1] Harold's Last Will and Testament (the "Will") was executed on October 8, 2012 and gives specific bequests to Rolland (life interest in a farm referred to in the Will as the "garage property," fixtures and equipment on that property, and all farm machinery and vehicles) and jointly to Harold's daughters (haying equipment, the home property, and the remainder interest in the garage property), among other bequests. He names his four children as residual beneficiaries of his estate.[2] The Will does

---

[1] I use first names in pursuit of clarity and intend no familiarity or disrespect.

[2] Tr. Ex. 32.

not mention Beaver Dam Farm, Inc. ("BDF"), a corporation Harold established in 1988 related to his farming business.

Letters of testamentary were issued to Donna as executrix of Harold's estate (the "Estate") on April 18, 2013. The inventory for the Estate was filed on September 18, 2013, and an amended inventory on January 8, 2014. Both inventories listed Estate property as including the garage property, with Rolland receiving a life interest in the garage property and Donna, Penny and Vicky each having a one-third remainder interest in the garage property; a home property, with the three daughters having a one-third interest in that property; a 49% interest in Beaver Dam Farm, Inc. (valued at $70,395.58); money from an insurance check; and farm and haying equipment.[3] The amended inventory listed Harold's PNC bank account as joint property with Donna, while the original inventory listed it as Estate property. The Estate's First and Final Account (the "accounting") was filed on May 15, 2014.[4]

Penny filed exceptions to the accounting on July 29, 2014, claiming that all proceeds in the BDF bank account at Harold's death were Estate property because Harold was the sole proprietor of the farming business since BDF was defunct at

---

[3] Tr. Exs. 1, 2.

3

the time of his death; proceeds from BDF's 2013 winter crops, 2013 fall crops, and its 2014 winter wheat crop should be included as part of the Estate; electric bills for the garage property were improperly paid by the Estate; a $3,200 commission should not be paid to the executrix; Harold's personal bank account was a convenience account and not a joint account with Donna; and Harold's personal cars (and a four digit Delaware license tag) were part of the residuary estate.

BDF responded to the exceptions on October 8, 2014 and denied that it was defunct since, although its charter was revoked for failure to pay franchise taxes in March 2012, BDF was revived on August 8, 2014 negating its prior void status.[5] BDF also claimed Harold owned 49%, and Rolland 51%, of BDF stock. Further, it asserted that BDF's only asset was its bank account and the executrix and Rolland, the majority owner, agreed that the Estate would receive 49% of the bank account for its interest in BDF. Donna's October 10, 2014 response to the exceptions echoed BDF's responses. Donna also stated that the Estate did not pay any garage property electric bills, the executrix's commission was justified, Harold's personal bank account was a joint account created with Donna, and Harold intended to

---

[4] The accounting included the total probate assets as stated on the Amended Inventory (adding additional farm equipment, credits and refunds), and subtracting debts, and providing for a $3,200 commission for the executrix. Tr. Ex. 3.

[5] Revival under 8 *Del. C.* § 312(e) means that the corporation is treated as if the certificate of incorporation had "at all times remained in full force and effect."

devise all of his vehicles and tags to Rolland. The trial on the exceptions was originally set for February of 2016, but was continued twice, once at Donna's request and once at Penny's request. On May 19, 2017, the Court wrote to the parties requesting a status report because it was unaware of any case activity since the previous May. Penny's counsel (who withdrew as counsel at that time) and Penny both responded, with Penny requesting a hearing. In July of 2017, Donna and Rolland filed motions to dismiss for failure to prosecute under Court of Chancery Rule 41(e). After briefing, those motions were denied.[6] Additional discovery ensued, a hearing on the exceptions was held on April 10, 2018, and simultaneous post-trial memoranda were submitted by the parties on May 10, 2018. In response to my letter dated August 8, 2016, Donna and Rolland filed additional submissions on September 7, 2018, and Penny provided comments on September 24, 2018. This is my final report.

## II. Analysis

Court of Chancery Rule 198 specifies the burden of proof in exceptions to an account.[7] Once exceptions are filed in compliance with Rule 198, the burden of proof falls on the executrix to demonstrate that the accounting was properly

---

[6] Denial of those motions was recommended in a Master's Final Report dated October 25, 2017, which was adopted by the Court on November 7, 2017. Docket Item ("D.I") 50; D.I. 53.

[7] Ct. Ch. R. 198.

prepared.[8] That burden shifts, however, where the exceptant seeks a surcharge. In those instances, the exceptant "must demonstrate affirmatively that a surcharge is warranted."[9] Exceptions are addressed by issue below.

### A. Status and ownership of Beaver Dam Farms, Inc.

Penny argues that BDF was defunct at Harold's death and, since there was no corporate entity, BDF was a sole proprietorship owned by Harold and all BDF assets should be included in the Estate.[10] The Estate and BDF claim that, although BDF was void at the time of Harold's death, it was subsequently revived and that revival eliminated its previous void status. It is undisputed that BDF was incorporated in Delaware in March of 1988; that BDF's certificate of incorporation became void multiple times over the years for failure to file the State of Delaware annual franchise tax reports and/or franchise taxes; and that BDF's certificate of incorporation was revived on three separate occasions.[11] Delaware law provides

---

[8] *In re Estate of Stepnowski*, 2000 WL 713769, at *1 (Del. Ch. May 2, 2000) (this "burden of proof reflects the fact that the administrator of the estate stands in a fiduciary capacity to the beneficiaries"); *see also In the Matter of Estate of Rich*, 2013 WL 5966273, at *1 (Del. Ch. Oct. 29, 2013).

[9] *In re Estate of Stepnowski*, 2000 WL 713769, at *1 n. 1.

[10] Penny points to Harold's failure to reference BDF in his Will, his use of the BDF business banking account for personal purposes, and the lack of complete financial records for BDF to support her claim that BDF was not a corporation.

[11] Tr. Ex. 35. Based upon records of the State of Delaware's Division of Corporation, BDF's certificate of incorporation was issued on March 5, 1988, and revived after becoming void on February 6, 2006, March 19, 2010, and August 8, 2014. Tr. Ex. 26.

that the revival of a voided certification of incorporation has "the same force and effect as if its certificate of incorporation had not been . . . void."[12] Such revival validates actions performed by the corporation during the time when the certificate of incorporation was void, and all property that belonged to the corporation when the certificate of incorporation became void (which was not disposed of prior to its revival) is "vested in the corporation, after its revival."[13] Although BDF's certificate of incorporation was void at the time of Harold's death, it was subsequently revived in August of 2014.[14] With that revival, under Delaware law, BDF was treated as if its certificate had not been voided and BDF retained its legal corporate status through Harold's death. Therefore, BDF was not "defunct" at the time of Harold's death and Harold was not the sole proprietor of BDF at that time.

And, BDF and the Estate assert that Harold owned 49%, and Rolland owned 51%, of BDF. Penny claims that Rolland has not proven his 51% ownership of

---

[12] 8 *Del. C.* § 312(e); *see Wax v. Riverview Cemetery Co.*, 24 A.2d 431, 436 (Del. Super. 1942) (non-payment of taxes forfeits the corporation's right to do business while it is void, but "does not extinguish the corporation as a legal entity").

[13] *Wax*, 24 A.2d at 436; *see Kostyszyn v. Martuscelli*, 2015 WL 721291, at *2 (Del. Super. Feb. 18, 2015) (the certificate instituting the revival "retroactively validated all of [the corporation's] actions taken during the time period the corporation was void"); *Kinney v. McKinney's Transmission Serv., Inc.*, 1980 WL 333071, at *1 (Del. Super. Jan. 9, 1980).

[14] BDF's status was listed as "void" as of March 1, 2012. Tr. Ex. 35. Effective August 6, 2014, BDF's certificate of incorporation was revived or renewed and taken out of "void" status. Tr. Ex. 26.

BDF. No documentary evidence showing the distribution of BDF's shares or ownership has been presented. It is undisputed that Rolland and Harold farmed together for close to 50 years.[15] Wilmer Powell ("Powell"), who was described as a trusted friend of Harold, testified in his deposition that he was "instrumental" in Harold's establishment of BDF in 1988 and prepared tax returns for BDF for approximately three years.[16] Powell also testified that BDF was a "family corporation" with "a father and son ownership of the stock."[17] He further stated that Rolland owned 51% and Harold 49% of BDF stock and that distribution was based upon legal advice that Harold should not be a majority shareholder because of Harold's financial difficulties.[18] Indeed, Rolland testified that he understood he was made majority shareholder of BDF because of his father's financial problems back in 1988.[19]

---

[15] Rolland testified that he left school in the 11th grade to farm full time with his father. Trial Tr. 177: 11-24.

[16] Tr. Ex. 36, Powell Dep. Tr. 6: 24-25; 13: 19 - 14: 5. Powell's deposition occurred on May 12, 2016. His deposition testimony was admitted as evidence under the hearsay exception for unavailable declarant since Powell died before the trial, and Penny's former counsel had been present and had the opportunity to elicit his testimony at his deposition. D.R.E. 804(b)(1).

[17] Tr. Ex. 36, Powell Dep. Tr. 7: 4-9.

[18] *Id.*, Powell Dep. Tr. 7: 10-13; 8: 22 - 9: 10. Those financial difficulties eventually led to Harold declaring bankruptcy in the early 1990s. *Id.*, Powell Dep. Tr. 6: 11-13.

[19] Trial Tr. 180: 22-23.

Rolland's wife, Paula Marvel ("Paula"), and his son testified at trial that Harold had stated that BDF was jointly owned by Rolland and him, with Rolland owning a majority interest.[20] Rolland testified that both Harold and Powell told him that he owned 51% of BDF.[21] BDF was a closely held family corporation that did not adhere to corporate formalities and its operations, including Harold's use of business funds for his personal purposes, reflected the personal dynamics of the relationship of its two shareholders, a father and son. Harold, as president of BDF, managed the farming business and Rolland followed his lead and was paid wages. BDF's management and compensation does not prove that Rolland did not have a majority interest in BDF. I find sufficient evidence was presented to show that Rolland held a 51% interest in BDF, and Harold held the remainder.

### B. Value of Beaver Dam Farms, Inc.

In this case, the Estate's share of Harold's 49% interest in BDF was valued at $70,395.58,[22] or 49% of the funds in the BDF bank account at the time of Harold's death. Penny argues that the Estate's interest in BDF was improperly valued, and that BDF's interest in the 2013 winter crops, 2013 fall crops and 2014

---

[20] Trial Tr. 93: 8-15; 149: 14 - 150: 5.

[21] Trial Tr. 179: 13 - 180: 1.

[22] BDF paid $5,405.82 on Harold's funeral bill, which was a debt of the Estate. When that amount was subtracted from $70,395.58 (representing 49% of the BDF bank account), the final amount paid to the Estate for its share of BDF was $64,989.76.

winter crops were not accounted for in that payment. BDF asserts that the typical approach the Court of Chancery uses in valuing a corporation is the capitalization of earnings method.[23] But, it also alleges that BDF's lack of records and record keeping would limit a forensic accountant's ability to value BDF.[24] And, that BDF lost money and had no earnings to capitalize, so the amount the Estate received for its share of BDF exceeded the value of Harold's interest. Further, BDF argues that the sale of Harold's interest would "necessarily require a minority discount," and the Estate's interest in BDF would have to be reduced to reflect that discount.[25] Penny expressed her belief that the limited financial information provided by BDF was not accurate and that correct information would show a profit.[26]

There are a number of approaches to valuing an interest in a closely held corporation for purposes of "cashing out" a shareholder. Valuation of corporate shares is "not a mechanical or rigid endeavor" and centers on ensuring that the

---

[23] BDF cites *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 469 (Del. Ch. 2011), and *Gonsalves v. Straight Arrow Publishers, Inc.*, 793 A.2d 312, 319 (Del. Ch. 1998), *aff'd in part, rev'd in part,* 725 A.2d 442 (Del. 1999), in support of using the capitalized earnings method for valuing businesses.

[24] D.I. 82, at 10.

[25] *Id.*

[26] D.I. 92.

shareholder receives the "fair or intrinsic value of his shares."[27]   Courts have recognized that "certain characteristics of family-owned or closely-held corporations make valuation of a stockholder's interest difficult."[28]

The problem with valuing BDF in this case is that there is very limited financial information available about BDF.  As suggested by BDF, the capitalized earnings method is one approach that has been used by this Court in determining the fair value of the corporate shares, "especially for companies with significant intangible assets and few fixed assets."[29]  To rely on that method, "two basic inputs [are required]: a measure of the company's earnings and a capitalization rate."[30] The information needed to use the capitalized earnings valuation method is not available in this case.

It is undisputed that BDF operated as a small family business in every sense – one in which Harold, the father, was the decision-maker and Rolland, the son,

---

[27] *Walter W.B. v. Elizabeth P.B.*, 462 A.2d 414, 415-16 (Del. 1983); *see Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1142-43 (Del. 1989) (discussing considerations for determining the "fair value" of the company's outstanding shares under Delaware's appraisal statute, 8 *Del. C.* § 262, for minority shareholders dissenting from a cash-out merger).

[28] *Petition of B & F Towing & Salvage Co., Inc.*, 551 A.2d 45, 49 (Del. 1988) (citation omitted).

[29] *Gonsalves,* 793 A.2d at 319 n. 18.

[30] The capitalization rate is obtained through a comparison with similar publicly traded companies whose market capitalization and earnings measures are publicly disclosed. *Id.* at 319.

helped to effectuate those decisions. I also recognize that, at this point – five years after Harold died – it would be difficult, if not impossible, to develop reliable financial records for BDF sufficient for experts to effectively perform a valuation of the business.[31] Given the limited information available, I conclude the Estate's interest in BDF should be valued based upon its proportional share of BDF's assets.

BDF had limited assets – at the time of Harold's death, it had $143,664.45 in its checking account and did not own any real property or farm equipment.[32] Post-trial, I offered the parties the opportunity to submit additional information to assist in the valuation determination. BDF submitted income and expense information for the period of March 22, 2013 to June 18, 2014. Considering BDF's earnings over that period (which is the only earnings information provided), it appears BDF's income approximated its expenses.[33] This information provides some

---

[31] Post-trial, BDF supplemented the record with an expert valuation of BDF, which stated that it is likely cost prohibitive to reconstruct BDF's missing financial records, and the "lack of complete financial records precludes the determination of [BDF's] assets and liabilities," making it "very difficult, if not impossible, to accurately determine the fair market value of [BDF]." D.I. 88, Ex. Aff. of Charles H. Sterner, Jr., CPA, CVA [hereinafter "Sterner Aff."] ¶ 4.

[32] The evidence indicated that Harold kept the farming equipment and property in his name and treated that equipment as if it was his (devised it through his will).

[33] BDF's income during that period totaled approximately $328,401.70. *See id.*, Ex. Aff. of Paula J. Marvel [hereinafter "Marvel Aff."]. This amount includes monies received for a loan payback from a business associate and an insurance refund which BDF excluded from its income calculation but I conclude should be considered income. Based

insight into BDF's general financial condition (which did not appear to be strong at that time), but it is not particularly useful in valuing the Estate's share since it covers the time period following Harold's death, rather than before his death, and is limited in scope.

At the time of Harold's death in March 2013, BDF's winter crops were in the ground – they had been planted between October and December of 2012 and were harvested in June or July of 2013.[34] Any profit from those crops should, proportionately, be included as part of BDF's assets for the purpose of valuing the Estate's share of BDF. However, the evidence does not indicate that those crops were profitable. The record shows that revenue from the 2013 winter crops was approximately $36,899.09, and expenses associated with producing those crops were comparable.[35]

---

upon the information provided, I determine BDF's total expenses during that period to be approximately $330,535.98. To calculate that total, I subtracted out expenditures for Harold's funeral, county property taxes (since BDF does not own any land), and the payout to the Estate for Harold's share. It appears that some of Harold's personal expenses were paid out of the BDF business account, although they are debts of the Estate. But, the financial records concerning Harold's personal expenditures are not sufficient to make appropriate adjustments in BDF's finances. And, Rolland, BDF's majority interest holder, has not expressed any objection to his father's expenditure of BDF's funds. Given these considerations, I decline to attempt to realign Harold's personal expenditures out of BDF funds. I note, however, that Harold's funeral costs ($5,405.84) were realigned, when the Estate reimbursed BDF for its payment of those expenditures.

[34] Trial Tr. 77: 5-11; 78: 3-9.

[35] Winter wheat was sold to Mountaire Farms ("Mountaire") in BDF's name on June 28 and 29, 2013 and July 15, 2013 for $31,397.76, and barley was sold to Perdue in BDF's

Although Peggy asserts that revenue associated with later BDF crops should

be considered in valuing the Estate's share of BDF, I do not find it fair to consider

name on June 24, 2013 for $5,501.33. *See* Tr. Exs. 11, 12. In its supplemental information, BDF indicated that the 2013 winter crop income was $36,903.09, but did not provide supporting documentation. *See* D.I. 88, Marvel Aff. Given the minimal difference ($4) and the lack of supporting documentation for BDF's income calculation, I will use $36,899.09 as the total income for BDF's 2013 winter crop. Expenses associated with the 2013 winter crops provided by BDF in its supplemental information totaled $33,324.99, when documented expenditures for seed, fertilizer and fungicide treatments, Rolland's wages in planting and harvesting the crops, and tractor fuel are included. *See id.* Marvel Aff. If equipment rental costs were added in, BDF calculated the 2013 winter crops' expenses at $42,248.90, not counting the rental costs for land BDF leases to grow crops. *Id.* I decline to include equipment rental costs, since the equipment used was owned by Harold (before his death) and Rolland (after Harold's death) and there was no evidence that BDF actually paid for its usage. BDF indicated that the average land rent it paid in 2012 – 2013 was $50 per acre and that winter crops were planted on 180 acres, which would indicate a cost of $9,000 over the two-year period, or approximately $4,500 each year. *Id.* BDF also stated that, on some of the land, a summer crop of beans is harvested after the winter crop, which would reduce land costs associated with the winter crops. Without more information, it is impossible to make conclusive determinations as to exact expenses associated with the 2013 winter crops; however, based upon the evidence, I find it reasonable to conclude that BDF's income for the 2013 winter crops did not exceed its expenses associated with those crops, except by a minimal amount. In her supplemental letter, Penny questioned including invoices for fertilizer and fungicide treatments occurring before Harold's passing. D.I. 92. Those treatments appear to have occurred when BDF's 2013 winter crops would have been the only crops in the ground, so it is reasonable that those treatments constitute expenses for the winter crops. Penny also complained that income received for winter crops in 2013 under Rolland's name should have been allocated to BDF and, with that income, winter crops would have shown a profit. *Id.* Rolland farmed under both BDF and his own name, and he and BDF separately received income from Mountaire for winter crops in 2013. Tr. Ex. 11. Although Penny claims Rolland kept BDF income as his own, there is no evidence to prove that allegation. Records show that crops taken to Mountaire were labeled as either BDF's or Rolland's, and the seed invoices provided by BDF for those crops were in BDF's name. *See* Tr. Ex. 11; D.I. 88. And, Rolland and Paula's 2013 federal tax return, which was admitted into evidence, shows farming income for Rolland individually. Tr. Ex. 28(A).

earnings from crops grown in the fall of 2013 or winter of 2014, after Harold died. Not only is revenue and expense information about those crops not readily available in the record, but no investments had been made in those crops (or expenses incurred) at the time of Harold's death. Following Harold's death, BDF operations fell solely on Rolland, and not on the Estate, so the Estate's investment in those crops, and rights to profit from those crops, have not been proven.

BDF argues that a minority discount should be applied in determining the value of the Estate's share of BDF, a closely held corporation. Its expert valuation stated that "[v]alues of closely held securities usually include discounts for lack of marketability," which are determined based upon "[v]arious empirical studies."[36] And, that it is not uncommon for minority discounts to range from 10-40%, which "severely and negatively" impact the value of minority interests in closely held entities.[37] However, no information or studies have been provided to show that a specific minority discount is warranted in this case. The general circumstances appear to indicate that Harold's minority interest would likely be discounted but, without supporting information, I do not find a basis for applying such a discount.

In summary, I conclude, in this case, the approach to fairly valuing the Estate's share in BDF is to divide BDF's assets proportionally between its two

---

[36] D.I. 88, Sterner Aff. ¶¶ 5, 6.

shareholders, Rolland and the Estate. This was the approach reflected in the Estate's accounting.[38] The evidence shows that BDF's only confirmed assets, at the time of Harold's death, were the funds in its banking account and its crops in the ground. Since there is no evidence that those crops were profitable, the value of the Estate's share is its proportional share of BDF's bank account. Sufficient information on BDF's finances is not available to rely on other valuation methods used for closely held corporations, such as the capitalized earnings method, or to apply a specific minority discount here. If the value is as BDF's expert opined – that the Estate's interest in this case "is likely to be worth only what the majority interest is willing to pay for it," then that criteria has been met because Rolland agreed to the proportional division of BDF's bank account.[39]

### C. Harold's personal bank account with Donna

Penny argues that Harold's PNC bank account ("PNC Account") was a convenience account and that the funds became part of the Estate at his death, while the Estate asserts that it was a joint account with Donna and the funds passed to her at Harold's death. Bank records show that the PNC Account, which held

---

[37] *Id.*, Sterner Aff. ¶ 6.

[38] I also find that the Estate's reimbursement for BDF's payment of Harold's funeral expenses as a part of this process was proper, since those expenses are clearly debts of the Estate.

[39] *Id.*, Sterner Aff. ¶ 7; Trial Tr. 183: 13 - 184: 14.

$9,036.93 at Harold's death, was titled in the names of Donna, Harold and Jean

Marvel (Harold's deceased wife).[40]

A convenience account is created by the true owner of the funds when he

adds names of other persons on the account so that those persons can access the

funds in the account if the owner is incapacitated and the funds are needed for his

benefit.[41] If the PNC Account was a convenience account in this case, Donna was

intended to have access to the account to make expenditures for Harold's benefit,

but would not have the right to keep the funds at Harold's death. If it was a true

joint tenancy, then the funds in the PNC Account passed to Donna and not to the

Estate. The ownership of bank accounts as joint tenancies with right of

survivorship are not favored in Delaware and there is a rebuttable presumption that

the bank account is owned as tenants in common unless the person "makes [his]

intentions explicit in the language used to create title to the property" that he

intends to create a joint tenancy with right of survivorship.[42] And, a transfer of

---

[40] Tr. Ex. 38.

[41] *See IMO Estate of Barnes*, 1998 WL 326674 (Del Ch. June 18, 1998).

[42] *IMO Estate of Hall*, 2014 WL 4948188, at *7 (Del. Ch. Oct. 2, 2014), *adopted* 2014 WL 4950090 (Del. Ch. 2014); *Speed v. Palmer*, 2000 WL 1800247, at *4 (Del. Ch. June 30, 2000) (joint tenancy "can only be created by clear and definite language not reasonably capable of any different construction") (citation omitted).

property for no consideration between close family members, such as between a parent and child, is "presumed to be a gift."[43]

The starting point in this analysis is the language in the bank documents: if the financial document creating the PNC Account includes "clear and definite language" showing that Harold intended to create a joint tenancy with right of survivorship, then "parol evidence may not be admitted to vary the terms of the instrument."[44] In this case, the PNC Account does not contain clear language showing that Harold intended to create a joint tenancy with right of survivorship with Donna. There is nothing on the signature card, or anything in the record related to the bank documents, that shows Harold intended to – or knew that – he was establishing a joint account when he added Donna. The bank information indicates that Donna's signature authorizes a "change in title" but fails to show whether the account is a joint account or to provide additional information that would elucidate Harold's intent.

Donna testified that PNC Bank confirmed the PNC Account's joint status when it closed the account and released the funds to her.[45] Donna also testified

---

[43] *IMO Estate of Hall,* 2014 WL 4948188, at *7; *Hudak v. Procek*, 727 A.2d 841, 843 (Del. 1999).

[44] *In re Estate of Gedling*, 2000 WL 567879, at *6 (Del. Ch. Feb. 29, 2000) (citing *Walsh v. Bailey*, 197 A.2d 331 (Del. 1964)).

[45] Trial Tr. 29: 8-12.

that she was added as signatory on the PNC Account "sometime after her mother died," and that the only person who had written checks on that account prior to that time was Harold.[46] She further testified that she knew the funds were her father's money; she never used any of the funds in that account for her own personal use during his lifetime, and that Harold "wanted [her] to have [the money] when he was gone."[47]

I find the evidence does not show that Harold intended the PNC Account to be owned in joint tenancy. Although the account was titled in Harold's and Donna's names and Donna states that Harold told her the money would be hers at his passing, other evidence indicates that all the funds in the account originated from Harold and the account was only used to pay his bills. Donna was also signatory on the BDF account for purposes of paying bills. Harold relied on Donna to help pay bills for him, when needed, using his money. And, Harold's estate plan generally anticipated an equal division among his daughters for the property they received. Accordingly, I conclude the PNC Account was a convenience account, and was not intended by Harold to be a joint account with, or

---

[46] Trial Tr. 65: 13 - 66: 9. Donna also testified that Harold knew the difference between a signatory account and a joint account because she was signatory on the BDF account and owned the PNC Account jointly with her father. Trial Tr. 28: 21- 29: 7. However, the BDF account information was not included as evidence so I cannot discern any differences, or similarities, in those accounts.

a gift to, Donna. The $9,036.93 in the PNC Account passed to the Estate at Harold's death.

### D. Executrix's commission

Penny alleges that Donna, executrix of the Estate, should not be paid a $3,200 commission. The Estate responds that the commission is justified given Donna's efforts. With this issue, Penny is seeking a surcharge and the burden falls on her to demonstrate that a surcharge is warranted.

Court of Chancery Rule 192 addresses the issue of fees for personal representatives of an estate, and states that, in determining the reasonableness of a personal representative's commission for administration of an estate, the Court may consider the time spent by the personal representative, risk and responsibility involved, the novelty and difficulty of questions presented, the skill and experience of the representative, provisions of the will regarding compensation, comparable rates for similar work and services in the community, the character and value of the assets, the loss of business necessitated by acceptance of the administration, and the benefits obtained for the estate by the administration.[48]

The $3,200 commission paid to Donna represented less than 1% (.32%) of the approximately $1 million Estate. Donna was responsible for compiling all bills

---

[47] Trial Tr. 28: 14-16; 44: 9-18.

20

and receipts and otherwise ensuring that all Estate expenses were paid, took unpaid time off work to address Estate issues. She traveled to the Estate's lawyer's office more than a dozen times to work on estate matters; resolved legal matters related to satisfaction of judgments and mortgages against Harold's real estate; and has been involved as the Estate's representative in this litigation for over four years.[49] Donna testified that she works in a local business' office, so she has some background in the type of work required for administering an estate.[50] Given all of these factors, I find that Penny has not met her burden of showing that the $3,200 commission paid to Donna was unreasonable.

### E. Other exceptions

Peggy's other exceptions relate to her claims that the Estate improperly paid the electric bills for the garage property (in which Rolland has a life interest) and that Harold's personal cars should have passed through the residuary estate. Donna denies that the Estate paid any electric bills for the garage property, testifying that the electric bills paid were for the home property.[51] I do not find

---

[48] Ct. Ch. R. 192.

[49] Trial Tr. 23: 11 - 24: 2.

[50] Trial Tr. 42: 17 - 43: 23.

[51] Trial Tr. 22: 18 - 23: 5. The Estate account shows that three electric bills were paid for three accounts on May 23, 2013 (for a total of $155.12) and on July 3, 2013 (for a total of $113.32). Tr. Ex. 19. There was some question about how there were three meters on the home property resulting in the multiple accounts but the evidence did not prove any

there was evidence that the Estate improperly paid electric bills for the garage property.

The Will states that Harold left all of his farm machinery (other than his haying equipment) and his vehicles to Rolland. Vehicles are not addressed otherwise in Harold's Will. Peggy claims that Rolland was not supposed to receive Harold's personal vehicle or the four-digit Delaware tag. There was testimony that Harold stated that he "forgot" when making his Will and meant to leave the car tag to Donna.[52] Regardless of the testimony concerning Harold's oral statements that he made a mistake, his Will addresses his vehicles and cannot be reformed to correct a mistake.[53] Further, Donna testified that Rolland gave her the car tag when she told him of Harold's wishes.[54] I find Harold's personal car (and

---

improper payments on electric bills and the amounts were *de minimis*. *See* Trial Tr. 36: 13 - 37:8.

[52] Trial Tr. 31: 4-8.

[53] *See, e.g., Miller v. Equitable Tr. Co.*, 27 Del. Ch. 282, 32 A.2d 431, 434 (1943) (the intent in a will must be enforced, "if the expression is plainly discernible from the language employed, and in such cases surrounding facts and circumstances can be of no importance"); *In re Will of Fleitas*, 2010 WL 4925819, at *5 (Del. Ch. Nov. 30, 2010) ("[i]f a mistake was made in the writing of the [will] ... this court has no power to correct a mistake, and it cannot, by introduction of parol evidence, rewrite the [will]") (citation omitted).

[54] Trial Tr. 64: 18 - 65:4.

the four digit Delaware license tag) were addressed in his specific bequest and were not part of the residuary estate.

## III.    Conclusion

For the reasons set forth above, I find that BDF was a corporate entity at the time of Harold's death through the subsequent revival of its certification of incorporation, and that Rolland held a 51% interest, and Harold held a 49% interest, in BDF.  I also conclude that Harold's former share in BDF was fairly valued through the proportional division of BDF's assets, consisting of its bank account, between its two shareholders, Rolland and the Estate.

In addition, I find the PNC Account was a convenience account and was not intended by Harold to be a joint account with, or a gift to, Donna, so the funds in that account passed to the Estate at Harold's death. Finally, I conclude the $3,200 commission paid to the executrix was reasonable, the Estate did not improperly pay electric bills for the garage property, and Harold's personal car and four-digit Delaware license tag were not part of the residuary estate.  I recommend that the Court adjust the accounting to reflect that the $9,036.93 in the PNC Account passed to the Estate at Harold's death.  This is a final report and exceptions may be

taken pursuant to Court of Chancery Rule 144.

Sincerely,

/s/ Patricia W. Griffin

Patricia W. Griffin
Master in Chancery

PWG/kekz